UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-4378(DSD/JJG)

Toll Bros., Inc., a
Pennsylvania corporation,

       Plaintiff,

v.                                              **FINDINGS OF FACT,**
                                                       **CONCLUSIONS OF LAW**
Sienna Corporation, a Minnesota               **AND ORDER FOR JUDGMENT**
corporation; Bruce G. Nimmer, an
Individual, Rodney D. Hardy, an
Individual, and John Hankinson,
an Individual,

       Defendants.


     Plaintiff Toll Bros., Inc. ("Toll Bros.") brought this breach of contract action on November 1, 2006,[1] against defendants Sienna Corporation ("Sienna"), Bruce G. Nimmer ("Nimmer"), Rodney D. Hardy ("Hardy") and John Hankinson ("Hankinson").  Defendants filed a counterclaim on November 21, 2006.[2]  After completion of discovery and pretrial proceedings, including two motions for summary judgment brought by plaintiffs that the court denied on June 15, 2007, and July 30, 2008, respectively, this matter came before the court sitting without a jury on October 20, 2008.  After three days

---

    [1]  Toll Bros. amended its complaint on December 28, 2006.

    [2]  Sienna amended its counterclaim on January 5, 2007.

of trial, testimony and argument, the receipt by the court of exhibits, post-trial briefs and proposals by the parties, the court makes the following:

**FINDINGS OF FACT**

**I.   The Parties**

1.   Plaintiff Toll Bros. is a Pennsylvania corporation engaged in the business of building luxury homes with its principal place of business in Horsham, Pennsylvania.

2.   Defendant Sienna is a Minnesota corporation engaged in the business of residential real estate development with its principal place of business in Edina, Minnesota.

3.   Defendants Nimmer, Hardy and Hankinson are Sienna's principals, and reside in Minnesota.

**II.  The Agreement**

4.   In 2004, Sienna began developing a residential project in Blaine, Minnesota, called the Gardenwood Development ("Gardenwood").

5.   On August 12, 2005, Toll Bros. and Sienna entered into an Agreement of Sale ("Agreement") wherein Sienna agreed to improve and sell land located in Gardenwood to Toll Bros. (Pl. Ex. 1 §§ 1, 4(b).)

6.   Specifically, Sienna agreed to complete the following improvements to the land ("Phase IA Improvements") by October 1, 2006:

> [F]inal grading for forty lots, construction of the entrance monument, entrance monument landscaping, hedge and column installation on Lexington Avenue, first lift of bituminous on the Parkway up to the community pool building and landscaping of the Parkway and medians, completion of construction of the community pool building, the commencement of pool construction and the acknowledgment from the City of Blaine that building permits would be available for those lots to be closed by the Buyer.

(Id. § 4(b).)

7.   In return, Toll Bros. agreed to close on at least ten lots after Sienna's completion of the Phase IA Improvements. (Id. §§ 4(b), 16(a).)

8.   Pursuant to the Agreement, Toll Bros. paid Sienna a $750,000 earnest money deposit ("Deposit").

9.   The Deposit was non-refundable "except in the event that the conditions to closing set forth herein are not satisfied and/or [Sienna's] default hereunder, a failure to provide as set forth herein or a condemnation." (Id. § 2(b).)

10.  Nimmer, Hardy and Hankinson personally guarantied Sienna's obligation to return the Deposit to Toll Bros. ("Guaranty Agreements"). (Pl. Exs. 2-4.)

3

11. The Guaranty Agreements also provided that "Guarantor[s] agree[] to pay all reasonable attorney's fees which may be incurred by beneficiary in enforcing this guaranty following any default on the part of guarantor[s] hereunder."  (Pl. Exs. 2 ¶ 14, 3 ¶ 14, 4 ¶ 14.)

12. The Agreement contained a "force majeure" clause, providing that:

> [The October 1, 2006, deadline] may be delayed by conditions beyond [Sienna's] control including, but not limited to Acts of God, casualty (not attributable to [Sienna]), terrorism, wars, insurrections, labor disturbances (when substitute labor is not available on commercially reasonable terms), shortages or delays in deliveries of materials (when substitute materials or delivery methods are not available on commercially reasonable terms).

(Pl. Ex. 1 § 4(b).)

13. To invoke the force majeure clause, Sienna was required to "give [Toll Bros.] prompt written notice, with full details following the occurrence of the cause relied upon."  (Id.)

14. In the event of Sienna's default, the Agreement stated that "[Toll Bros.] shall be entitled at [its] election to (I) the immediate return of the deposit, or (ii) to specifically enforce this Agreement against [Sienna] as it relates to the applicable closing."  (Id. § 9.)

15.  It is the policy of Toll Bros. to begin selling its luxury homes only after a substantial portion of the amenities at a project site have been completed.  (Tr. at 76, 82, 411.)[3]

16.  Toll Bros. negotiated the October 1, 2006, deadline with Sienna to coordinate its sales and marketing activity with Minnesota's peak home-selling season.  (Id. at 83, 359-60, 579.)

17.  Sienna knew the October 1, 2006, deadline was important to Toll Bros.  (Id. at 80-81, 83-84, 363, 582; Pl. Ex. 10.)

### III.  The Dispute

18.  On August 25, 2006, Sienna informed Toll Bros. by letter that it would not meet the October 1, 2006, deadline and that the Phase IA Improvements would not be complete until the latter part of November 2006.  (Pl. Ex. 5.)  Sienna stated that its inability to meet the deadline was excused under the force majeure clause due to delays caused by the City of Blaine ("City") and the Minnesota Pollution Control Agency ("MPCA").

19.  According to Sienna, delays had occurred during the City's preparation of a feasibility study, its review of Sienna's draft Environmental Assessment Worksheet ("EAW"), its approval of Sienna's proposed preliminary plat and its issuance of engineering comments in response to Sienna's grading plan, as well as during the MPCA's review of the draft EAW.  (Id.)

---

[3]  "Tr." refers to the trial transcript.

20. Toll Bros. responded with a letter on August 28, 2006, stating that the force majeure clause did not excuse Sienna's inability to meet the October 1, 2006, deadline, terminating the Agreement and demanding that Sienna return the Deposit. (Pl. Ex. 6.)

21. Sienna did not return the Deposit to Toll Bros.

22. Toll Bros. commenced this action on November 1, 2006, alleging that Sienna's August 25, 2006, letter anticipatorily breached the Agreement and that Nimmer, Hardy and Hankinson are jointly and severally liable for the return of the Deposit to Toll Bros. (Pl. Ex. 107.)

23. Sienna counterclaimed on November 21, 2006, seeking a declaratory judgment that the August 28, 2006, letter from Toll Bros. anticipatorily breached the Agreement and that Sienna is entitled to retain the Deposit.

**IV.  The Development Process**

24. Sienna had to work with the City and the MPCA to gain approval of its development plan before it could commence the improvements at Gardenwood.  This process required the completion of a feasibility study, the City's review of Sienna's draft EAW, proposed preliminary plat and grading plan and the MPCA's review of

the draft EAW and its issuance of a negative declaration stating that an environmental impact study of the project was not necessary.

25. Tom Scott ("Scott"), Project Coordinator for the City's Engineering Department, was Sienna's primary contact at the City.

### A. The Feasibility Study

26. Sienna was required to pay for the cost of the feasibility study. (Tr. at 175.) The City invoiced Sienna for the study on November 2, 2004, and requested payment within 30 days. (Pl. Ex. 112.) Sienna paid the invoice on January 18, 2005. The City could not commence the feasibility study until it received Sienna's payment. (Tr. at 175-77, 336.)

27. The City timely completed the feasibility study on June 2, 2005, approximately four-and-a-half months after its commencement and two months before Sienna signed the Agreement with Toll Bros. (Id. at 179, 594-95.)

### B. The Draft EAW

28. The City was required to submit a draft EAW to the MPCA before it could commence sewer and water work at Gardenwood. The MPCA then had to review the EAW to decide whether an environmental impact study was required before work could begin at the site. (Id. at 419.)

29. Sienna hired Pioneer Engineering ("Pioneer") to complete the draft EAW for the City. The City authorized Pioneer to do this work on or about August 18, 2005. (Pl. Ex. 34.)

30. Pioneer provided a draft EAW to the City on October 13, 2005. (Pl. Ex. 35.) The draft, however, was missing appendices B and C, and the City could not submit the incomplete draft to the MPCA. (Tr. at 192-93, 196-97; Pl. Ex. 32.) Upon the City's request, Pioneer provided both appendices to the City by October 31, 2005. (Pl. Ex. 106.)

31. Thereafter, the City timely reviewed the document and submitted it to the MPCA on November 4, 2005. (Tr. at 196; Pl. Ex. 35.)

### C.   MPCA Review

32. Denise Leezer ("Leezer"), the MPCA project manager assigned to review the draft EAW, testified that a typical review period lasts four to six months. (Tr. at 423-24.)

33. During the MPCA's review, Leezer sent an email to Pioneer, John Vogelbacher ("Vogelbacher") - Sienna's project manager - and Scott on December 14, 2005, requesting a plat map. (Pl. Ex. 36.) The email did not specify to whom the request was directed. Leezer sent a second email to Vogelbacher on December 16, 2005, in which she made the same request, copying Pioneer, Scott and others on the email. (Pl. Ex. 39.) Scott responded to Leezer's request on December 28, 2005. (Pl. Ex. 41.)

34. Scott reasonably believed that Pioneer was responsible for responding to the MPCA's requests for information relating to the EAW that Pioneer had drafted. (Tr. at 206-07, 210-13.) Furthermore, Scott timely responded when the MPCA requested information directly from the City. (Id. at 212-13.)

35. The MPCA issued a negative declaration on March 27, 2006, stating that an environmental impact study of the project was not necessary. (Pl. Ex. 45.) There was nothing unusual about the duration of the approval process. (Tr. at 433-34, 609-12.)

### D.  Preliminary Plat Approval

36. The City timely approved Sienna's preliminary plat on April 6, 2006, and the timing of its approval did not affect Sienna's ability to meet the October 1, 2006, deadline. (Id. at 215-16, 684.)

### E.  Grading Plan Approval

37. The City had to approve Sienna's grading plan before Sienna could commence the Phase IA Improvements. (Id. at 215-16.)

38. Typically, the City reviews a proposed grading plan and issues engineering comments to the developer. The developer must then modify its plan or submit additional information to the City. (Id. at 218-20.)

39. Between July 12, 2005, and June 26, 2006, Scott reviewed Sienna's six proposed grading plans and issued six sets of engineering comments. (Pl. Exs. 46, 48, 51, 52, 54, 56.)

9

40. Sienna did not provide the City with all of the requested information or revise its grading plan to incorporate all of the City's recommended changes.  (Tr. at 225-36; Pl. Ex. 100 at 9.)

### 1.   Soil Report

41. For instance, Sienna knew that the City had to review soil borings and a geotechnical report ("Soil Report") before it would authorize Sienna to commence grading at Gardenwood.  (Tr. at 626-27, 726-29.)  From July 2005 until April 2006, the City requested this information from Sienna four times.  (Id. at 226-27, 230-31, 233-34, 627-28, 726-29; Pl. Exs. 46, 48, 51, 52.)

42. Sienna first gave the City a Soil Report on May 5, 2006. (Tr. at 236, 238-39, 619, 625, 623-33, 710, 729.)  That Soil Report, however, was dated August 16, 2004, and indicated that contaminated soil existed at Gardenwood.  (Id. at 236-37, 727; Pl. Ex. 68.)  Scott timely reviewed the 2004 Soil Report and informed Sienna on June 6, 2006, that the City needed an updated Soil Report. (Tr. at 245; Pl. Exs. 77, 109 at ¶ 9.)

43. On June 8, 2006, Sienna provided the City with a February 8, 2006, Soil Report which was supplemented by an April 28, 2006, addendum ("2006 Soil Report") (Tr. at 242; Pl. Exs. 69,[4] 71, 72,

---

[4] As acknowledged by the parties at trial, the first page of Exhibit 69 is incorrectly dated April 28, 2005, and should be dated April 28, 2006.

79.) Scott timely reviewed the 2006 Soil Report and provided Sienna with engineering comments on June 14, 2006. (Tr. at 251, 618-19; Pl. Ex. 54.)

44. The 2006 Soil Report was in Sienna's control at the time it provided the City with the 2004 Soil Report. Sienna offered no credible reason why it did not earlier provide the 2006 Soil Report to the City.

### 2. Watershed District Permit

45. Sienna also knew that it was required to submit a Rice Creek Watershed District permit ("RCWD permit") to the City before the City would approve Sienna's grading plan. (Pl. Ex. 94 ¶ 64.) From July 2005 until July 2006, the City informed Sienna six different times that it needed to submit the RCWD permit. (Tr. at 227-28, 230-31, 233-34, 251, 639-40; Pl. Exs. 46, 48, 51, 52, 54, 56.)

46. Sienna submitted a RCWD permit on July 6, 2006. (Tr. at 620-21; Pl. Ex. 67.) The City approved Sienna's grading plan the same day. (Pl. Ex. 57.)

### 3. Letter of Map Revision

47. Approximately thirty of the forty lots that Sienna was required to grade during the Phase IA Improvements were located on a flood plain. (Tr. at 97.)

48. In the Agreement, Sienna promised to process a Conditional Letter of Map Revision ("CLOMR") with the Federal

Emergency Management Agency. (Pl. Ex. 94 ¶ 35.) The CLOMR would remove the "flood plain" designation from certain Gardenwood lots, enabling the City to issue building permits to Sienna. (Tr. at 374; Pl. Ex. 1 ¶ 27.) From July 2005 until July 2006, the City told Sienna six times that it needed to obtain a CLOMR. (Tr. at 226, 231, 233-34, 251; Pl. Exs. 46, 48, 51, 52, 54, 56.) By August 24, 2006, however, Sienna had not begun the CLOMR application process. (Tr. at 655; Pl. Ex. 91.)

**V.   Notice of Delays**

49.  On May 4, 2006, Vogelbacher assured Toll Bros. that Sienna would complete the Phase IA Improvements by September 2006. (Pl. Ex. 9.)

50.  On multiple occasions between June 22, 2006, and July 26, 2006, Toll Bros. requested that Sienna provide a detailed schedule indicating when each of the Phase IA Improvements would be completed. (Tr. at 109; Pl. Exs. 10-15.)

51.  On July 26, 2006, Sienna gave Toll Bros. a proposed schedule. The schedule, however, was incomplete and did not include many of the Phase IA Improvements. (Tr. at 117-18, 695-96; Pl. Ex. 19.)

52.  The July 26, 2006, schedule indicated that one of the required Phase IA improvements - the grading of forty lots - would not be complete until November 2006. (Pl. Ex. 19.) Nonetheless, Sienna told Toll Bros. it would meet the October 1, 2006, deadline

by doubling the number of construction crews working on the project. (Tr. at 120, 382.) The July 26, 2006, schedule did not indicate that Sienna intended to invoke the force majeure clause nor did it provide details about any delays. (Pl. Ex. 19.)

    53.  The August 25, 2006, letter was the first time Sienna gave Toll Bros. clear notice that it would not meet the October 1, 2006, deadline and that it intended to invoke the force majeure clause. (Tr. at 103-04, 123-25, 378, 384-85.) The events Sienna cited as "delays" occurred long before August 2006. For instance, the feasibility study was completed fourteen-and-a-half months prior to Sienna's letter, the City submitted the EAW to the MPCA nine-and-a-half months prior to the letter, the MPCA issued its negative declaration on March 27, 2006, five months prior to the letter, the City approved Sienna's preliminary plat four-and-a-half months prior to the letter and the City approved Sienna's grading plan one-and-a-half months prior to the letter. (Pl. Exs. 5, 33, 37, 45.) Furthermore, Vogelbacher testified that by July 26, 2006, he was aware that Sienna would not meet the Phase IA Improvement deadlines. (Tr. at 676; Pl. Ex. 19.)

**VI. Stipulation**

    54.  The parties stipulated that:

> [I]n the event the court finds that Sienna is liable to Toll Bros. for the return of the $750,000 deposit, (1) each of the guarantors ... shall be jointly and severally liable to Toll Bros. for $750,000 and (2) the court may, without further notice to any party, and in

13

> addition to whatever other findings, conclusions or orders the court makes, enter findings of fact in accordance with this stipulation and order judgment in favor of Toll Bros. and against Nimmer, Hardy and Hankinson, jointly and severally, for damages in the amount of $750,000, plus any interest, costs, disbursements and attorney's fees ordered by the court.

(Ct. Ex. 1.)

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this case under 28 U.S.C. § 1332.

2. "The primary goal of contract interpretation is to determine and enforce the intent of the parties." Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271 (Minn. 2004). The court interprets the Agreement according to its plain and ordinary meaning because it is clear and unambiguous. See id.

3. An anticipatory breach of contract is the "unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed for his performance." Drydal v. Golden Nuggets, Inc., 689 N.W.2d 779, 785 n.4 (Minn. 2004) (citing In Re Haugen, 278 N.W.2d 75, 79 n.6 (Minn. 1979)).

4. The October 1, 2006, deadline was a material term of the Agreement.

5. The court determines that Sienna's August 25, 2006, letter clearly stated that Sienna would not meet the October 1, 2006,

deadline and constituted an anticipatory breach of the Agreement. (Pl. Ex. 5.)

6.   Sienna bears the burden of proving by a preponderance of the evidence that the Agreement's force majeure clause excused its anticipatory breach.  See Den Mar Constr. Co. v. Am. Ins. Co., 290 N.W.2d 737, 743 (Minn. 1979) (defendant obligor bears burden of proving justifiable breach); 17B C.J.S. Contracts § 716 (2008) ("A party who asserts the performance of the contract on his part has been excused has the burden of establishing the facts relied on for such excuse.").

7.   Under the Agreement, the force majeure clause applies only if Sienna proves (1) that the October 1, 2006, deadline was delayed due to "conditions beyond Seller's control" and (2) Sienna gave Toll Bros. "prompt written notice, with full details following the occurrence of the cause relied upon."  (Pl. Ex. 1 § 4(b).

8.   Sienna has not shown by a preponderance of the evidence that the force majeure clause excused its anticipatory breach.  The October 1, 2006, deadline was delayed due to events and circumstances within Sienna's control.  Sienna did not timely (1) pay the City the cost of its feasibility study, (2) provide the City a complete draft EAW and an up-to-date Soil Report or (3) apply for a RCWD permit or a CLOMR.  (Tr. at 175-77, 245-46, 257-58, 339-

40, 376-78.)  Furthermore, Sienna was aware of the delays months before August 2006, but did not give Toll Bros. prompt written notice.

9.   Therefore, Toll Bros. was entitled to treat Sienna's repudiation of the contract as a breach and to bring this action for damages.  See Space Center, Inc. v. 451 Corp., 298 N.W.2d 443, 450 (Minn. 1980) (citation omitted) (party may treat repudiated contract as terminated and demand damages); Wormsbecker v. Donovan Constr. Co., 76 N.W.2d 643, 651 (Minn. 1956) (same); Crowell v. Nw. Life & Sav. Co., 108 N.W. 962, 964 (Minn. 1906) (same).

10.  Under the Agreement, Toll Bros. is entitled to the immediate return of the Deposit.  (Pl. Exs. 1 §§ 2(b), 9.)

### ORDER FOR JUDGMENT

Pursuant to the foregoing Findings of Fact and Conclusions of Law, **IT IS ORDERED AND ADJUDGED** that:

1.   Defendants are jointly and severally liable to refund the Deposit to Toll Bros. within 10 days of the entry of this Order;

2.   Defendants are jointly and severally liable for the costs and attorney fees incurred by Toll Bros. in enforcing the Guaranty

Agreements in an amount to be determined by the court following post-judgment submissions regarding costs and attorneys fees by the parties.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 7, 2009

                                              <u>s/David S. Doty</u>
                                              David S. Doty, Judge
                                              United States District Court